ROBERTS, J.,
for the Court:
¶ 1. Kellye Meek Houston divorced Brock Houston due to Brock’s uncondoned adultery. The Lafayette County Chancery Court awarded Brock custody of the couple’s two minor children, and ordered Kel-lye to pay Brock $600 per month in child support. Based on the chancellor’s equitable distribution of the marital estate and Kellye’s substantial separate estate, the chancellor denied Kellye’s request for alimony. Kellye appeals and claims the chancellor should have awarded her alimony. Kellye further claims the chancellor erred by ordering her to pay Brock $600 per month in child support. Finally, Kel-lye claims the chancellor should have ordered Brock to pay for the two minor children’s college expenses. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Kellye and Brock were married in December 1987. Shortly after they married, Brock enlisted in the United States Air Force, where he was trained as a pilot. In 1989, Kellye and Brock had a daughter, Hillary. A few months after Hillary’s first birthday, Kellye was injured in a serious car accident. Among other injuries, she broke her jaw and one of her ankles. Despite Kellye’s injuries, Kellye and Brock added to their family. Their oldest son, Jake, was born in 1991. In 1998, they had another son, John Hale.
¶ 3. In 1995, FedEx hired Brock as a pilot. Brock’s earnings substantially increased. Brock flew out of Memphis, Tennessee, which is within driving distance of the marital home in Oxford, Mississippi. Since 1995, Brock has consistently worked for FedEx.
¶ 4. Kellye’s parents, Ed and Becky Meek, were frequently discussed through *286 out the divorce proceedings. The Meeks consistently provided a substantial amount of supplemental income to Kellye and Brock’s family. Conservatively, the Meeks gave Kellye between $2,000 and $4,000 per month. The Meeks provided financial assistance when Kellye and Brock bought the marital home. The Meeks also bought all of Kellye and Brock’s children’s clothes from the time the children were born. Later, the Meeks bought a vehicle for Jake and paid for Jake to attend boarding school in upstate New York. Kel-lye’s 2002 Toyota Land Cruiser was a gift from her parents. The Meeks also paid for numerous trips for the entire Houston family. Additionally, Kellye was able to rely on her parents for any supplemental financial assistance that she needed. The Meeks also established seven trusts that benefit either Kellye or Kellye and Brock’s children. Suffice it to say that it is undisputed that the Meeks’ financial assistance allowed Kellye and Brock’s family to live a lifestyle that they would have otherwise been unable to afford.
¶ 5. Kellye’s work history is limited. As of 2009, Kellye was within thirty-five hours of obtaining a bachelor’s degree. Sometime prior to 2000, Kellye’s father hired her to work as an administrative assistant at his publishing company in Oxford. Although the record does not specify when Kellye began working for her father, she stopped working for him sometime during 2000, after she and he argued.
¶ 6. Over time, Kellye began experiencing greater jaw pain due to the injuries that she sustained in the 1990 car accident. According to Kellye, the pain left her unable to adequately care for the children. Because of Kellye’s inability to care for the children and Brock’s schedule as a pilot, their children began to spend significant time with the Meeks. During 2001, John Hale began living with the Meeks.[1] Between 2008 and 2005, Kellye had numerous surgeries to repair her jaw. Ultimately, both of Kellye’s temporomandibular joints were replaced.
¶ 7. As time passed, Kellye and Brock’s relationship deteriorated. In late 2007 or early 2008, Brock had an affair that was characterized as a “one-night stand.” Kel-lye confronted Brock after she heard a rumor that he had been unfaithful to her. Brock confessed, and Kellye asked him to leave the marital home. Brock complied. Although Kellye later asked Brock to return to the marital home, Brock refused to do so.
¶ 8. Kellye told her parents that she could not continue to live in the marital home. Consequently, Kellye moved out of the marital home. Kellye’s mother, Becky, bought a house for Kellye. At the time of the trial, Kellye was living in the house that her mother bought for her. Brock had moved into a loft apartment in a barn that was located on property that he and his siblings had inherited from his family. Meanwhile, the marital home remained empty. Hillary lived in her own apartment while she attended college at the University of Mississippi. Jake was in boarding school in upstate New York. And John Hale continued to live with the Meeks.
¶ 9. In September 2008, Brock filed a complaint for divorce based on habitual cruel and inhuman treatment or, alternatively, irreconcilable differences. Kellye filed a counter-complaint for divorce based on Brock’s uncondoned adultery. Kellye and Brock both requested physical custody of the children. In November 2009, they went to trial.[2] Over the course of four *287 days, the chancellor heard testimony from Brock, Kellye, and Kellye’s mother, Becky. Additionally, Brock and Kellye each called expert witnesses to testify regarding the trusts that the Meeks established for Kel-lye and the couple’s three children.
¶ 10. Ultimately, the chancellor granted Kellye’s request for a divorce based on Brock’s uncondoned adultery, which Brock admitted during his testimony. By the time the chancellor entered her judgment, Hillary had reached the age of majority. The chancellor awarded Brock physical custody of Jake and John Hale. Additionally, the chancellor ordered Kellye to pay Brock $600 per month in child support. Based on Kellye’s separate estate and the division of the marital estate, the chancellor denied Kellye’s request for periodic or rehabilitative alimony. Kellye appeals.
STANDARD OF REVIEW
¶ 11. An appellate court will not disturb a chancellor’s findings of fact when those findings are supported by substantial evidence unless the chancellor abused her discretion, was manifestly wrong, or the chancellor applied an erroneous legal standard. Rogillio v. Rogillio, 101 So.3d 150, 153 (¶ 11) (Miss.2012).
ANALYSIS
I. ALIMONY
¶ 12. Kellye claims the chancellor erred by declining to award alimony. “[T]he decision to award alimony is left to the discretion of the chancellor.” Id. at 154 (¶ 18). “In the case of a claimed inadequacy or outright denial of alimony, we will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion.” Id. at 153 (¶ 11).
¶ 13. “The purpose of alimony is not punitive, but instead, is designed to assist the spouse in meeting his or her reasonable needs while transitioning into a new life.” Faerber v. Faerber, 13 So.3d 853, 863 (¶ 36) (Miss.Ct.App.2009) (quoting Holley v. Holley, 892 So.2d 183, 185 (¶ 7) (Miss.2004)). “Accordingly, the chancellor should consider alimony only after the equitable division of the marital property.” Id. The chancellor awarded Kellye the following marital property: (1) two specified bank accounts and any other bank account in which she has an interest; (2) her two individual-retirement accounts; (3) one-half of Brock’s two retirement accounts; (4) one-half of the net proceeds of the sale of the marital home; (5) one-half of the net sales proceeds from three rental properties; and (6) various items of personal property, including her 2002 Toyota Land Cruiser. Additionally, the chancellor ordered Brock to pay all of the marital debt. Kellye does not claim that the chancellor erred when she divided the marital estate. However, Kellye argues that the chancellor erred in valuing her separate estate based on the fact that she is the beneficiary of a “Generation-Skipping Trust” (GST).
¶ 14. Kellye and her sister are the beneficiaries of a trust that was characterized as a “Children’s Trust.” That trust owns a $4,500,000 life-insurance policy on the lives of Kellye’s parents. Kellye notes that “[tjhere was no testimony ... as to the cash value of that life[-]nsurance policy. Thus, there is no value that can be attributed to Kellye as a result of her being a beneficiary of the Children’s Trust.” However, there is no indication that the chancellor based Kellye’s separate estate on the Children’s Trust.
*288 ¶ 15. Regarding the GST, Brock’s expert witness, Joe M. Duncan, testified that Becky created the GST to provide Kellye with “sufficient income and principle to provide for her health, education, support, and welfare.” Kellye’s father is the trustee of the GST. Duncan went on to testify:
If [Kellye’s father] determines that [Kel-lye’s needs] ... are taken care of or satisfied, then the trust can be used for the benefit of [Kellye’s children]. But the trust makes it clear that the interests of Kellye are ... to be considered paramount over any residuary beneficiary or any remainder beneficiary. In fact, the trustee is instructed or directed to make trust investments with Kellye in mind.
However, Kellye’s expert witness, David V. Grisham, opined that Kellye’s father is not obligated to release any of the trust funds to Kellye. Grisham noted that the language of the GST provided:
[T]his trust is not being created for the purpose of creating a disincentive for Kellye[ or Brock] to work and earn a living for themselves and their children, but is being created to provide for their needs, especially in the event that health problems should preclude one of them from being able to work, or in the event that health problems should cause them to need additional support and medical care because of their health situations.
¶ 16. Duncan and Grisham disagreed whether Kellye’s father would be obligated to provide Kellye with funds from the GST in the event that Kellye reasonably needed money “for her health, education, support, and welfare.” Duncan testified:
[I]f [Kellye] has a need that falls within the category of health, education, support^] or maintenance, ... and [Kellye’s father] says, “I’m ... just not going to give you any money[,]” ... chancery courts in Mississippi have the right to come in and oversee that discretionary standard to make sure that it is not exercised in an unreasonable manner.
But Grisham testified that Kellye’s father has “total discretion” regarding whether to disburse funds from the GST, and Kellye has no right to withdraw from the GST or require that her father disburse any funds from it. Grisham also testified that “[i]t doesn’t make any difference what other people extraneous to this document think about what the intentions were or that language that is used.”
¶ 17. In any event, as of November 30, 2009, the corpus of the GST included a Morgan Keegan account with a balance of approximately $3,600,000 and a certificate of deposit worth approximately $244,000. During 2008, the GST generated approximately $370,000 in income. Tax returns indicated that the GST distributed approximately $460,000 in dividends during 2006, but Kellye testified that she had not received any distribution from the GST. It is unclear what happened to the 2006 dividends from the GST.
¶ 18. According to Kellye, although she is the primary beneficiary of the GST, “she may never receive any funds from it.” Kellye notes that she received no money from the GST during the two years prior to the trial. Kellye reasons that the chancellor should not have included the GST when she calculated Kellye’s separate estate. Alternatively, Kellye argues that the chancellor should have calculated the value of the GST more conservatively. According to Kellye, “the chancellor failed to recognize that Kellye’s interests in the trusts are not worth the same as the trusts themselves.” Kellye cites this Court’s opinion in Dogan v. Dogan, 98 So.3d 1115 (Miss.Ct.App.2012), to support her argument that the chancellor should have valued the GST more conservatively.
*289 ¶ 19. In Dogan, the chancellor divided a divorcing couple’s estate and found that the wife’s separate estate included a living trust that was worth $250,000 to $300,000. Id. at 1121 (¶ 7). On appeal, the wife argued that the chancellor erred in valuing her portion of the living trust, which contained a total corpus worth approximately $760,000. Id. at 1125 (¶ 22). The chancellor valued the wife’s share of the trust at $250,000 to $300,000 because the living trust could have possibly been obligated to feed a separate trust that paid the wife’s stepmother $55,000 in the event that the stepmother depleted her own trust. Id. The living trust also paid “the maintenance and expenses associated with [the stepmother’s] home and premiums on a joint life-insurance policy that fund[ed] another trust.” Id. This Court held that “[njeither party produced a specific and reliable valuation of the [l]iving [t]rust; therefore, the burden fell on the chancellor to [value the living trust] using the provided evidence!.]” Id. at (¶ 23). Consequently, this Court found no merit to the wife’s claim that the chancellor improperly valued the living trust. Id. at (¶¶ 23-24).
¶ 20. We do not find that the chancellor erred in considering Kellye’s interest in the GST. Although the chancellor did not specifically value Kellye’s interest in the GST, the chancellor found that “Kellye is the beneficiary of several trusts worth well over $3,000,000.”[3] Unlike the living trust in Dogan, the GST in which Kellye had an interest was not obligated to fund any other trusts or beneficiaries. Kellye notes that her father had not distributed any of the funds from the GST during 2007 and 2008. Even so, the chancellor may have concluded that Kellye’s father chose not to distribute funds from the GST because the consistent financial gifts that Kellye received from her parents were enough to meet her needs. Except for a brief period following an argument, Kellye’s parents had consistently given her an “allowance” for the twenty-two years that she and Brock were married. That “allowance” simply continued after Kellye and Brock separated. And while Kellye’s father could have possibly distributed funds from the GST to Kellye’s children, he could only do so in the event that Kellye’s needs were met first. Furthermore, the language of the GST provides: “To the extent that Kellye notifies the trustee that she has sufficient income! ] or other assets to provide for [her health, education, support, and welfare], the trustee may then accumulate the income and add it to the principal at least annually.” We find that the chancellor acted within her discretion when she valued Kellye’s interest in the GST.
THE ARMSTRONG FACTORS
¶ 21. In Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993), the Mississippi Supreme Court held that a chancellor is to weigh the following factors when considering a request for alimony:
1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require *290 that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be “just and equitable” in connection with the setting of spousal support.
In declining to award Kellye alimony, the chancellor found:
Kellye’s earning capacity is probably not as great as Brock’s for the near future if you consider only her earned income, but the [c]ourt must not discount the fact that her parents have been giving her substantial income all throughout the marriage and that they have established extensive, valuable trusts for her benefit. Looking at the obligations and assets of the parties, Kellye has a much greater net worth than Brock, considering their respective non-marital assets or assets not subject to distribution, since Kellye is the beneficiary of several trusts worth well over $3,000,000.00 and she has taken no marital debt, but Brock, on the other hand, has assumed all of the marital debts and has divided his marital assets, but has only a small inheritance that was not valued at the trial of this case.... It is very clear that Brock’s standard of living has decreased from that [which] he had during the marriage of the parties, but Kellye’s standard of living does not seem to have been affected because of the “gifts” her parents continue to bestow upon her.... There was extensive testimony of Kellye’s dissipation of marital assets or maybe assets that were gifted to her by her parents in the form of an allowance. Brock and Becky Meek both tes-tifie[d] that Kellye overspentf,] and there were pages of exhibits to document her excessive e[B]ay purchases. Finally, this court cannot and will not in good conscience, award alimony to a wife with a net worth substantially greater than that of the husband.
Kellye argues that the chancellor should have found that ten of the Armstrong factors favored an award of periodic alimony, and the remaining two factors were neutral in that they did not favor either her or Brock.[4]
1. The income and expenses of each party.
¶ 22. Although Kellye does not claim that the chancellor erroneously divided the marital estate, she argues that the division of the marital estate left her with a deficit in that she did not receive enough liquid assets to support her. “When one party will suffer a deficit after the marital property has been equitably divided, alimony should be considered.” Rogillio, 101 So.3d at 155 (¶ 19). Additionally, Kellye argues that the chancellor erred in calculating her income based on *291 her parents’ gifts and the trusts her parents established. Ultimately, Kellye argues that “[t]he chancellor erred in failing to find that a comparison of Kellyef’s] and Brock’s income[s] and expenses favored an award of alimony.”
¶ 23. Kellye notes that Brock’s financial statement under Rule 8.05 of the Uniform Chancery Court Rules was inaccurate because some of his monthly expenses were inflated. Kellye highlights those inaccuracies. For example, Kellye draws our attention to the fact that Brock’s Rule 8.05 statement indicated that he was paying $120 per month to maintain the marital home, including maintenance of the yard. But on cross-examination, Brock admitted that he had not been paying those expenses. To avoid unnecessary elaboration on the intricacies of the accounting discrepancies that Kellye alleges, it should suffice to say that Kellye claims that Brock underestimated his monthly adjusted gross income by approximately $3,000. According to Kellye’s calculations, Brock has a monthly surplus of approximately $4,000.
¶ 24. Next, Kellye claims that the chancellor did not award her with sufficient liquid assets to support herself. Kellye notes that none of the checking accounts had a “significant [balance] at the time of the trial.” Kellye argues that she cannot rely on her retirement accounts, because she has not reached the age of retirement and she “would be subject to penalties and taxes if she withdrew funds from ... the retirement accounts.” Furthermore, she argues that Brock has not reached the age of retirement, so she cannot rely on his retirement accounts to meet her needs. Regarding her half of the proceeds from the marital home and the three rental properties, Kellye claims that she will have to use those funds “to purchase another residence.” However, it is unclear why Kellye would need to buy another house. Kellye voluntarily left the marital home and moved into a house that her parents bought for her. Kellye does not have to pay anything to live in that house. There was no evidence that Kellye’s parents planned to force her to move out of the house. Nor was there evidence that Kel-lye planned to move out of the house. Consequently, there is no reason to conclude that Kellye will have to use the proceeds from the sale of the marital home and the three rental properties to buy another house.
¶ 25. Kellye then argues that she had approximately $16,000 in monthly expenses. She attributed nearly $7,000 of those expenses to her own needs, and approximately $9,000 per month in expenses related to the children. Kellye also argues that she had no income because she has been unemployed. Consequently, Kellye contends that she has a monthly deficit of approximately $16,000 per month. Kellye concludes that Brock’s ability to pay his monthly expenses compared to her own inability to do so weighed in favor of alimony.
¶ 26. First and foremost, Kellye’s expenses are grossly misstated. Kellye was clearly not paying $9,000 in monthly expenses related to the children. None of the three children lived with her. The undisputed testimony was that the Meeks had paid for all of the children’s clothing and school expenses from the time the children were born. Hillary was a twenty-year-old college student at the time of the trial. She lived in her own apartment. There was evidence that Kellye occasionally . gave Hillary some money, but the Meeks paid for all of Hillary’s college expenses, and Brock paid for a significant amount of Hillary’s living expenses. Brock also paid for Hillary’s car. There was no evidence that Kellye paid for any of the expenses associated with Jake’s board *292 ing school. The Meeks bought Jake’s vehicle. And John Hale lived with the Meeks for several years, so Kellye did not pay any of John Hale’s expenses. At best, Kellye spent $800 per month on the children’s entertainment in the form of eating out and going to movies. Otherwise, there is no indication that Kellye paid for any of the children’s expenses.
¶ 27. Furthermore, Kellye admitted that her own Rule 8.05 financial statement was not an accurate reflection of her monthly expenses. Contrary to her Rule 8.05 financial statement, she did not pay approximately $2,750 per month in mortgage payments. Brock had been paying the mortgage on the marital home. Kel-lye’s mother bought the house in which Kellye lived, and Kellye did not have to pay anything to live there. Additionally, Kellye’s mother paid for all of Kellye’s utilities, food, clothes, maintenance of Kel-lye’s house, and maintenance of Kellye’s car.
¶ 28. Kellye also claims that the chancellor erred by finding that Kellye’s income was $3,000 per month based on the average value of the amount of money her parents gave her each month. To support her argument, Kellye cites Robinson v. Robinson, 554 So.2d 300, 305 (Miss.1989), in which the supreme court held that when determining whether to award separate maintenance:
[w]e do not think it proper to consider mere gratuities given to the complainant by her father. The duty to support the wife rests upon the husband, and he cannot avoid the performance of this duty by showing that the father will probably see that the wife does not suffer because the father is able to do so and is manifesting a disposition to meet the wants of the daughter.
As discussed above, except for a brief period after an argument between Kellye and her father, her parents had consistently provided her with an “allowance” of between $2,000 and $4,000 per month for the entire duration of Brock and Kellye’s marriage. It was within the chancellor’s discretion to conclude that Kellye’s “allowance” amounted to more than “mere gratuities.” True enough, there was no evidence that Kellye had earned, any income since she stopped working for her father in 2000. However, the $2,000 to $4,000 figure was actually a conservative estimate when Kellye’s parents pay for so many of her other expenses. And the Meeks had supplemented Kellye’s lifestyle for years before Kellye and Brock separated. Prior to the separation, Kellye’s mother created a joint checking account and allowed Kel-lye to write checks from that account. There was evidence that approximately $70,000 passed through that account in one year. Although Kellye and her mother testified that the Meeks’ financial contributions became loans rather than gifts after Kellye and Brock separated, the chancellor acted within her discretion when she disregarded that testimony. The Meeks never asked Kellye to sign a promissory note, and there was no indication that the Meeks ever intended to have Kellye repay them.
¶ 29. To be clear, we do not interpret the chancellor as having penalized Kellye for the fact that her parents give so generously to her. Instead, the chancellor merely accepted the reality of the unique circumstances — Kellye’s parents consistently paid for practically all of Kellye’s expenses and regularly supplemented her income. The chancellor did not find that the Meeks were obligated to support Kel-lye. The chancellor simply recognized that the Meeks had consistently and voluntarily supported Kellye.
2. The health and earning capacities of the parties.
¶ 30. Kellye argues that “given [her] history of poor health, the chancellor *293 should have awarded [her] periodic alimony.” As Kellye notes, the chancellor held:
Kellye has numerous physical and emotional/mental issues. In fact, during the pendency of this action, she fought the efforts to hav[e] her deposition taken by having her psychiatrist indicate that she was not well enough to participate in [a deposition]. There was extensive testimony of her physical ailments that put her to bed. There was also extensive testimony about her alcohol abuse and her extensive use of prescription medications that interfered with her ability to interact normally.
Kellye further notes that the chancellor held that Kellye’s “unstable emotional state” and her “health issues” weighed against awarding her custody of the children. According to Kellye, “the chancellor made contradictory findings” when she concluded that Brock was not obligated to pay Kellye alimony. While analyzing the health-of-the-parties factor, the chancellor held that “[a]lthough Kellye testifie[d] that she had been suffering from serious health and emotional issues that had prevented her from working, caring for her children[,] and being a wife to Brock, she testified that she was better and that she anticipated going to work upon completion of her de[g]ree.” According to Kellye, “[i]t was not tenable for the chancellor to believe both that Kellye had severe mental and physical problems [that] prevented her from providing primary childcare and that Kellye was well enough to finish her degree and reenter the work force.”
¶ 31. We disagree. It was within the chancellor’s discretion to find that Kellye’s health and emotional problems made her less suitable for primary physical custody of the children, but also to find that those health and emotional problems did not prohibit her from earning a college degree or reentering the workforce. The two concerns are not necessarily mutually exclusive.
¶ 32. Regarding her and Brock’s earning capacities, Kellye notes that her earning capacity is significantly less than Brock’s. The chancellor held:
Kellye’s earning capacity is probably not as great as Brock’s for the near future if you consider only her earned income, but the [c]ourt must not discount the fact that her parents have been giving her substantial income all throughout the marriage and that they have established extensive, valuable trusts for her benefit.
Kellye argues that the chancellor erred by finding that Kellye’s earning capacity was $3,000 per month based on the salary that she received while she was working for her father’s business. To support her argument, Kellye notes her testimony that her earning capacity was minimum wage, since she did not have a college degree. We agree that the salary Kellye received while she worked for her father is not an accurate reflection of her earning capacity. There was testimony that Kellye’s position and her salary were somewhat pretexts to justify the “allowance” that her parents gave her. Kellye had not even attempted to find a job after Brock left the marital home. Kellye did not testify that she was unable to work. She certainly has some earning capacity, but having made no attempt to earn an income, it is difficult to calculate her earning capacity with any accuracy. Even if the chancellor erred when she calculated Kellye’s earning capacity, we do not find that her error, in and of itself, is the equivalent of reversible error. As stated previously, the chancellor’s analysis of the Armstrong factors was comprehensive. It was within the chancellor’s discretion to weigh all of the Armstrong factors when she refused Kellye’s request for alimony.
*294 3. The needs of each party.
¶33. According to Kellye, the chancellor should have found that this factor favored ordering Brock to pay alimony. Kellye’s reasoning is based on the following concepts: (1) she relies on her parents to support her; (2) she has a monthly deficit of approximately $16,000; and (3) Brock has a monthly surplus of approximately $4,000. Kellye raises these same arguments under other factors. It is unnecessary to reiterate the inaccuracies regarding Kellye’s claim that she has a monthly spending deficit of $16,000. For brevity’s sake, we simply state that it was within the chancellor’s discretion to weigh all of the Armstrong factors when she refused Kellye’s request for alimony.
4. The obligations and assets of each party.
¶ 34. Kellye claims “[t]he chancellor should have found this factor weighed in favor of awarding alimony to [her].” Kellye’s entire argument under this heading is as follows: “While neither party was left with any significant liquid assets after property division, Brock continued to receive a healthy income from his job at FedEx.” We do not find that this factor justifies reversing the chancellor’s decision.
5. The length of the marriage.
¶ 35. According to Kellye, “the chancellor failed to give appropriate weight to the fact that the parties were married for twenty-three years.” Kellye cites Sanderson v. Sanderson, 824 So.2d 623 (Miss.2002), to support her claim. In Sanderson, the supreme court held:
[W]e find that the length of this marriage [ (approximately twenty-two years)], the fact that Mrs. Sanderson was a full-time mother and homemaker, the fact that Mr. Sanderson did not have a retirement plan, the great disparity between the non-marital assets, and the great disparity in their capacities to produce future income make the amounts of the lump sum and rehabilitative alimony awards insufficient to do equity in this case.
Id. at 626 (¶ 13). Consequently, the supreme court found that “the rehabilitative alimony award of $54,000.00 and lump sum alimony award of $200,000.00 [was] insufficient in light of the parties’ prospects for future earnings and retirement.” Id. at 627. Although the length of the parties’ marriage was certainly one of the factors that the supreme court discussed, the disparity in the parties’ incomes and their capacities to produce future income were also factors. Id. at 626. The length of the marriage was not the sole determining factor in the supreme court’s decision.
¶ 36. Kellye also cites Buckley v. Buckley, 815 So.2d 1260 (Miss.Ct.App.2002), to support her argument that the length of the marriage favored an award of alimony. Again, the length of the marriage was certainly mentioned in this Court’s analysis in Buckley, but it was simply one of many factors that were discussed. Id. at 1263-66 (¶¶ 11-36). Additionally, in discussing the length of the marriage, this Court simply noted that the chancellor had “found that the Buckleys’ twenty-year marriage was ‘long-standing.’ ” Id. at 1264 (¶ 21). At best, Kellye’s authority supports the concept that the length of the marriage is but one factor that must be considered when determining whether to award alimony. Although the length of the marriage could reasonably support an award of alimony, in light of the chancellor’s discretionary authority to balance other factors against the length of the marriage, we do not find that the chancellor erred.
*295 6. The presence of children in the home.
¶ 37. Kellye argues that this factor should have been neutral regarding whether alimony was necessary. The chancellor awarded Brock custody of the two minor children. Kellye did not appeal the chancellor’s custody determination. We do not find that the chancellor erred in her application of this factor to her decision to refuse Kellye’s request for alimony.
7. The age of each party.
¶ 38. The chancellor incorrectly found that Brock and Kellye were within four years of the same age. At the time of the trial, Kellye was forty-two years old, and Brock was forty-eight years old. The chancellor’s incorrect statement of the parties’ ages is of no moment. However, Kellye claims that the chancellor erred “in failing to consider the difficulty of Kellye reentering the workforce at her age and with her long medical history and limited work experience.” According to Kellye, “this factor should have weighed in favor of an award of alimony.”
¶ 39. Brock disagrees. As the chancellor noted, per FedEx policy, Brock must retire when he reaches his sixty-fifth birthday. Consequently, Brock had approximately fifteen years remaining in his career. When he retires, Brock must split a significant portion of his retirement with Kellye. Brock also notes that Kellye has no mandatory age limitation regarding the amount of time she may work. We find that the chancellor did not abuse her discretion when she did not find that this factor favored awarding alimony.
8. Each party’s standard of living.
¶40. The chancellor held that “Brock’s standard of living has decreased from that [which] he had during the marriage of the parties, but Kellye’s standard of living does not seem to have been affected because of the ‘gifts’ her parents continue to bestow upon her.” Kellye claims the chancellor erred. According to Kellye, “[t]his factor should have weighed in favor of an award of alimony.” Kellye’s reasoning is based on the concept that “Brock will continue to enjoy a large income and a high standard of living as a result of his employment as a FedEx pilot. [But she] will not enjoy the same standard of living-unless her parents choose to pick up the slack for Brock.”
¶ 41. To support her argument, Kellye relies on McKissack v. McKissack, 45 So.3d 716 (Miss.Ct.App.2010). In McKissack, the chancellor equitably distributed a couple’s property and then analyzed a wife’s request for alimony. Id. at 723 (¶ 37). The wife had a college degree, but she had “virtually no work experience during the marriage.” Id. She had “a monthly income of approximately $800 from her part-time employment as an interior designer.” Id. The chancellor found that the wife needed “ample liquid resources to maintain her in some semblance of her accustomed style and manner of living.” Id. at (¶ 38). The chancellor’s decision was based on “the wide disparity in the parties’ incomes and their ability to earn income.” Id. The chancellor specifically found “that the property [the wife] received in the equitable distribution would produce some income, but not enough to maintain [her] lifestyle.” Id. Consequently, the chancellor awarded the wife $6,000 per month in periodic alimony. Id. at (¶ 39).
¶ 42. Unlike the wife in McKissack, Kellye’s standard of living has not suffered. The chancellor reasonably concluded that Kellye’s standard of living has remained the same, and Brock’s standard of living has decreased. As stated by the chancellor, at the time of the trial, Brock was “living in a loft apartment in a barn *296 located on some land that he owns jointly with his siblings that they [had recently inherited].” Kellye was living in a house that her parents bought for her. Under these circumstances, we do not find that the chancellor abused her discretion.
9. Fault or misconduct.
¶43. The chancellor held that “both parties are equally at fault in the fault of the marriage.” The chancellor also held:
The demise of this marriage hás been coming for a long time. There are numerous contributing factors to its demise, such as the wife’s illnesses and her apparent withdrawal from the family and from her responsibilities to her marriage, her parents’ continued “help” both financially and otherwise which tended to undermine the marriage, the fact that the husband worked out of town quite a bit and was thus absent from the home for periods of time. The final straw that caused the separation of the parties was Brock’s one-night-stand affair that he admitted to Kellye and admitted on the stand in open court.
According to Kellye, “the chancellor did not give appropriate weight to the fact that the dissolution of this marriage was caused by Brock’s unfaithfulness.” Kellye also notes that she testified that Brock was “physically and verbally rough” on their son, Jake. And Kellye claims that the chancellor failed to properly weigh her testimony that Brock drank too much. Kellye argues that the chancellor should have found that this factor weighed in favor of awarding alimony.
¶ 44. The chancellor was aware of Brock and Kellye’s philosophical differences regarding the discipline of Jake, who was in boarding school for reasons related to discipline problems at the time of the trial. However, it was within the chancellor’s discretion to conclude that Brock and Kellye’s philosophical differences regarding discipline did not contribute to the erosion of the marriage. It was not unreasonable for the chancellor to conclude that every disagreement during the marriage did not necessarily relate to fault or misconduct. Furthermore, there was ample testimony that both parties drank to excess, and there was evidence that Kellye’s reliance on prescription medication “interfered with her ability to interact normally.” Considering the totality of the circumstances, the chancellor did not abuse her discretion when she found that both parties were at fault for the demise of the marriage, despite the fact that Brock’s affair was the final catalyst that brought about its demise.
10. Dissipation of assets.
¶ 45. The chancellor held that “[t]here was extensive testimony of Kellye’s dissipation of marital assets or maybe assets that were gifted to her by her parents in the form of an allowance.” According to Kellye, “the chancellor gave undue consideration to Kellye’s eBay purchases.” Kel-lye claims that she “should not have been penalized in the chancellor’s alimony analysis when any money she overspent wa[s] given to her by her parents and [she] did not cause any wasteful dissipation of marital assets.” (Emphasis in original). Additionally, Kellye argues that Brock wasted marital assets when he withdrew $42,000 from his 401 (k) to pay his attorneys’ fees. Kellye states: “While Brock spent tens of thousands of dollars in marital funds to pay his attorneys’ fees, Kellye used not one cent of marital funds to pay her attorney[s]. Instead, the Meeks paid for all of Kellye’s attorneys’ fees.”
¶ 46. Brock argues that “the chancellor determined that [the Meeks’] regular and historical monetary gifts should be eonsid- *297 ered as sources of income [that] ..., whether gifted or not, [were] marital asset[s], some of which [were] commingled with Brock’s earnings, and [were] dissipated through Kellye’s excessive spending.” We find that the chancellor acted within her discretion in finding that Kellye dissipated marital assets. Despite the chancellor’s finding, there is no indication that the chancellor gave significant weight to this factor when she declined to award Kellye alimony.
11. Any other factor.
¶47. Under this factor, Kellye summarizes her argument that the chancellor erred when she did not order Brock to pay alimony. Kellye claims all of the factors except two favored ordering Brock to pay her alimony. However, we have found that the chancellor did not abuse her discretion when she considered the factors discussed above. Although the chancellor could have possibly reached different conclusions, the chancellor weighed the evidence in a reasonable manner. “[A]limony is not a bounty to which the wife became entitled to receive indefinitely simply by reason of the fact that at one time she had been married to the husband.” Graham v. Graham, 767 So.2d 277, 280 (¶ 8) (Miss.Ct. App.2000) (quoting Beacham v. Beacham, 383 So.2d 146, 148 (Miss.1980)). “In the case of a claimed inadequacy or outright denial of alimony, we will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion.” Rogillio, 101 So.3d at 153 (¶ 11). We do not find that the chancellor’s decision is oppressive, unjust, or grossly inadequate. Consequently, we find that the chancellor did not err when she refused Kellye’s request for alimony. This issue is without merit.
II. CHILD SUPPORT
¶ 48. Kellye claims the chancellor erred by ordering her to pay Brock $600 per month in child support. According to Kellye, the chancellor incorrectly concluded that she has an income of $3,000 per month. We have discussed Kellye’s claim in our analysis above. There is no need to reiterate the point. Suffice it to say, it was within the chancellor’s discretion to conclude that Kellye had received at least $3,000 per month from her parents for a significant time.
¶ 49. Kellye also repeats her claim that she has a monthly spending deficit of approximately $16,000. Again, we addressed that claim above, and we found no merit to it. Kellye most certainly does not spend approximately $9,000 per month on the three children. Nor does she have approximately $7,000 per month in expenses related solely to herself.
¶ 50. Brock received custody of the couple’s two minor children. Under the circumstances, it was within the statutory guidelines for the chancellor to order Kel-lye to pay Brock child support in the amount of twenty percent of her adjusted gross income. See Miss.Code Ann. § 43-19-101(1) (Supp.2012). The term “adjusted gross income” includes “all potential sources that may reasonably be expected to be available to the absent parent.” Miss.Code Ann. § 43-19-101(3)(a). The chancellor actually valued Kellye’s adjusted gross income rather conservatively, considering that some evidence suggested that Kellye’s parents gave her more than $3,000 per month. We find no merit to this issue.
III. COLLEGE EXPENSES
¶ 51. Finally, Kellye claims that the chancellor should have ordered Brock to pay the two minor children’s college expenses. Kellye did not raise the issue of the children’s educational expenses in her *298 counter-complaint for divorce, her amended counter-complaint for divorce, or any other pleading prior to the chancellor’s judgment. Kellye first raised this issue in her posttrial “motion to alter and/or amend judgment, for new trial and for relief from judgment.” However, Kellye’s attorney cross-examined Brock regarding whether he was willing to pay the minor children’s college expenses. Brock testified that he would pay for the children’s educational expenses if the Meeks were not willing to allow the children to access the trusts that the Meeks had established for them.
¶ 52. The Meeks had established trusts for all three of Brock and Kellye’s children. The primary purpose of those trusts was to provide a postsecondary education for the children. The youngest child was also a beneficiary of a separate trust that did not place the same emphasis on education. Instead, that trust was established to “provide extras” that his parents are not able to provide.
¶ 53. Additionally, the Meeks established a “Grandchildren’s Trust” to provide extras for all of the grandchildren. Kel-lye’s expert witness testified that the Grandchildren’s Trust was not intended to discharge Brock and Kellye from their obligation to support their own children. According to Kellye, the “trusts should not be used as an excuse for why Brock should not first be obligated to pay for the children’s college expenses.” Kellye further argues that her parents “should not be compelled to provide for the children’s college educations, but that is in essence what the chancellor ordered.” We disagree. The Meeks were not compelled to establish any of the trusts that benefit their grandchildren. The Meeks established those trusts of their own free will, and they did so well before Brock and Kellye separated. Brock testified that he would fund the two minor children’s college educations if the Meeks would not allow the children to access their trusts. It was within the chancellor’s discretion to decline to address the children’s college expenses when the children have access to trusts that are intended to fund their college educations, and Brock testified that he was willing to pay for their education if the Meeks would not allow the children to access their trusts. This issue is without merit.
¶ 54. THE JUDGMENT OF THE LAFAYETTE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J„ DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. As of the time of the trial, John Hale was still living with the Meeks.

. Because the local chancellors had recused, the Mississippi Supreme Court appointed a *287 special chancellor to hear Brock's complaint and Kellye’s counter-complaint.

. There was no evidence that Kellye was the beneficiary of "several” trusts. The record indicates that Kellye was the beneficiary of two trusts. However, the chancellor’s incorrect reflection of the number of trusts in which Kellye has an interest is of no moment for the purposes of this issue.

. We note that the chancellor's analysis of the Armstrong factors was comprehensive in that she addressed the relevant factors, but she did not discuss each factor separately and then determine whether each factor favored or disfavored an award of alimony. Additionally, the chancellor's analysis of the Armstrong factors was after her child-custody determination and her division of the marital estate. For brevity’s sake the chancellor often related her discussion of the Armstrong factors to similar considerations in her prior rulings. We do not mention these aspects of the chancellor’s analysis as a form of criticism-we merely intend to accurately frame the manner in which she conducted her analysis.