# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00785-COA

**GREGORY JOSEPH GUSSIO**                                                    **APPELLANT**

**v.**

**SARA DAVIS GUSSIO**                                                          **APPELLEE**

DATE OF JUDGMENT:              07/17/2020
TRIAL JUDGE:                   HON. ROBERT GEORGE CLARK III
COURT FROM WHICH APPEALED:     MADISON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        RICK D. PATT
ATTORNEYS FOR APPELLEE:        WILLIAM R. WRIGHT
                               ALICIA CLIFTON BALADI
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED - 09/26/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     The Madison County Chancery Court granted Sara Davis Gussio a divorce from Greg Gussio on the grounds of habitual cruel and inhuman treatment and, alternatively, constructive desertion, and awarded Sara physical and legal custody of the parties' three minor children.  The court also held that the parties' prenuptial agreement was valid and enforceable and divided the limited marital estate that the prenuptial agreement did not address.  Finally, the court ordered Greg to pay Sara child support of $2,000 per month; lump-sum alimony of $250,000, with half payable within one month and the remainder payable in sixty monthly installments; rehabilitative alimony of $1,500 per month for thirty months; and $200,000 for attorneys' fees.

¶2.     On appeal, Greg does not challenge the grant of a divorce or award of custody to Sara, but he asserts that the chancery court erred in the amount it set for him to pay in child support, as well as by failing to impute income to Sara; in awarding alimony; by denying his motion in limine to exclude testimony and evidence regarding Sara's attorneys' fees; in awarding Sara attorneys' fees;[1] and by denying his motion to alter or amend the judgment to consider new evidence.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.     "[A]s fact-finder, the chancellor is the sole judge of the credibility of witnesses . . . ." *Newsome v. Peoples Bancshares Inc.*, 328 So. 3d 87, 92 (¶25) (Miss. 2021) (internal quotation marks omitted).  With this in mind, we note that the chancellor found that Sara was credible and honest and that Greg had repeatedly lied to the point that it reflected negatively on his moral fitness.  Indeed, the chancellor found that "[t]he overwhelming evidence proved that Greg has an inability to tell the truth."[2]  Therefore, our recitation of the facts takes account of the chancellor's credibility determinations.

¶4.     Sara and Greg were married in May 2008.  About two weeks before the wedding date,

---

[1] On November 7, 2022, Sara's counsel filed a motion for attorneys' fees and supporting affidavit seeking appellate attorneys' fees pursuant to Mississippi Rule of Appellate Procedure 27(a).  Greg's counsel did not file a response.  That motion will be addressed by separate order.

[2] The guardian ad litem, Attorney Jeff Rimes, also concluded that Greg repeatedly had been dishonest and untruthful in his statements to him and under oath.  Additionally, the chancellor cited *Gussio v. Mississippi Real Estate Commission*, 122 So. 3d 783 (Miss. Ct. App. 2013), in which this Court held that the Mississippi Real Estate Commission "clearly had adequate evidence to support its decision that Greg made substantial misrepresentations in his dealings with [prospective homebuyers]." *Id.* at 787 (¶16).

Greg presented Sara with a prenuptial agreement he wanted her to sign. Sara was several months pregnant with Greg's child by this point. Sara was twenty-six years old at the time and had one young child from a prior marriage. Greg was thirty-nine years old and had been married once before. Sara testified that shortly before Greg asked her to sign the prenuptial agreement, he had asked her to quit her job at a bank to be a stay-at-home mother, which she did. Greg had also given Sara's landlord notice that she would be ending her lease.

¶5.     Sara took the prenuptial agreement to an attorney to review and then requested certain changes. In response, Greg became angry, refused to make any changes, "ripped" Sara's engagement ring off her finger, stated that the wedding was off, and told Sara "to get the 'F' out of his house." Sara was greatly upset and "panicked" by the situation. She ultimately relented and signed the agreement two days before the wedding. The agreement provided that all property owned by either party prior to the marriage would remain their separate property and that they each waived any claim to the other's separate property in the event of a divorce. The financial statement that Greg attached to the prenuptial agreement showed assets with a net value of $4,721,000, not including his interests in multiple limited liability companies (LLCs). Greg owned the marital home prior to the marriage, and it remained his separate property pursuant to the prenuptial agreement. Sara had no significant assets at the time of the marriage.

¶6.     Sara and Greg had three children during their marriage, a daughter born in 2008, a son born in 2010, and a daughter born in 2012.

¶7.     In April 2013, Sara filed for divorce on the grounds of habitual cruel and inhuman

3

treatment and constructive desertion or, in the alternative, irreconcilable differences. Greg denied that Sara was entitled to a divorce on fault grounds and would not consent to an irreconcilable differences divorce. He filed a motion to bifurcate the case and try Sara's fault grounds first, which the court granted.

¶8. The court entered an agreed temporary order in August 2013 providing for temporary child support and spousal support. The temporary order was modified several times prior to the entry of a final judgment. Under the terms of the original temporary order, Sara and the children remained in the marital home. The temporary order provided that she and Greg should have separate bedrooms and bathrooms and that neither party should enter the other party's bedroom or bathroom without permission. However, the arrangement proved unworkable, and Sara and the children moved out of the marital home in February 2014.

¶9. Sara's request for a fault-based divorce was tried over the course of six days in June and July 2015. In April 2016, the chancellor entered a judgment granting Sara a divorce on the ground of habitual cruel and inhuman treatment. The chancellor stated that he would enter an opinion with findings of fact and conclusions of law at a later date. The chancellor reserved all remaining issues for trial at a later date. Greg filed a notice of appeal, but a panel of the Supreme Court dismissed the appeal for lack of a final judgment. Order, *Gussio v. Gussio*, No. 2016-TS-00861 (Miss. Sept. 15, 2016).

¶10. In April 2017, the chancellor entered findings of fact and conclusions of law supporting the prior judgment of divorce. The chancellor found that "Sara's testimony was credible" and that Greg was not credible. The chancellor concluded that Sara's credible

4

testimony, together with other corroborating evidence, justified a divorce on the grounds of habitual cruel and inhuman treatment and, alternatively, constructive desertion. The chancellor provided a lengthy list of cruel behaviors, including but not limited to the following:[3]

- "On a daily basis, Greg called [Sara] names such as stupid, bitch, lying skank, immature, and slut." He also belittled her in front of her parents.

- "Greg required Sara to engage in sexual acts which she found to be repulsive . . . ."

- Greg spent many nights away from home, often without explanation. Sara testified that "about six nights a month," Greg would say he was staying at his father's house and not come home. One month, he was gone seventeen nights. When Greg did not come home, he would tell Sara that "he wasn't coming back."

- Greg constantly threatened Sara with divorce and would pretend to call a divorce lawyer in her presence. He would tell Sara she would "have nothing" after the divorce and that he would keep their children.

- Greg exerted extreme "financial control" over Sara to the point that her father had to pay for necessities and car repairs. Greg did not give Sara enough money to pay for the children's needs. Instead, he told her to leave her shopping cart in the customer service area at Target so that he could go to the store later to decide which items to buy. When Greg failed to go to Target, Sara asked her father for money.

- When Greg faced various lawsuits related to his business dealings, he would try to avoid service of process by insisting that Sara tell process servers that she was a babysitter.

---

[3] We omit some of the findings and details included in the chancellor's opinion because Greg has not appealed the grant of a divorce. However, "[t]he law is settled that a chancellor *must* consider fault when determining alimony." *Gerty v. Gerty*, 265 So. 3d 121, 133 (¶43) (Miss. 2018) (emphasis added). Therefore, the chancellor properly incorporated his findings regarding Greg's fault into his subsequent ruling on alimony, which Greg does appeal. Accordingly, some discussion of the chancellor's opinion on grounds for divorce is necessary notwithstanding that Greg has not appealed that decision.

5

• Greg caused Sara great emotional distress by leaving her then-three-year-old son and their then-ten-week-old daughter at home alone at night. Greg left the children at home alone because Sara was having dinner with a friend, and Greg thought she had been gone too long. Sara's friend corroborated Sara's testimony regarding the incident, testifying that she and Sara found the young children at home alone.

¶11. In October 2017, the chancellor held a hearing on the parties' cross-motions for a declaratory judgment regarding the validity of the prenuptial agreement. Sara argued that the agreement was invalid because it was unconscionable, she signed it under duress, and Greg failed to fully disclose assets. In November 2017, the chancellor held that the agreement was valid and enforceable. Therefore, the chancellor ruled that he would not consider Greg's separate property, as identified in the prenuptial agreement, when dividing the marital estate.

¶12. In December 2017, the chancellor heard evidence on all remaining issues, including child custody and support, division of the marital estate, alimony, and attorneys' fees. In February 2020, the chancellor entered a judgment with findings of fact and conclusions of law addressing all remaining issues. The chancellor found that seven *Albright*[4] factors favored Sara, that four were neutral, and that no factors favored Greg. The chancellor granted Sara physical and legal custody of the children and granted Greg visitation.[5]

¶13. The chancellor found it was difficult to determine Greg's income for purposes of calculating child support because the evidence suggested that Greg was "not being forthright

---

[4] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

[5] The chancellor declined to grant joint legal custody because he found that during litigation, "Greg ha[d] used [the temporary] joint legal custodial arrangement to continue to abuse Sara, to continue to control her, and to continue to use the kids in an attempt to hurt Sara." In contrast, Sara had acted in "good faith" in attempting to co-parent with Greg.

6

[regarding] his financial condition" and had "not provided a clear picture of his income and assets." For example, the income shown on Greg's financial disclosures and tax returns appeared to be inconsistent with financial statements he made to banks, his lifestyle, and his spending habits. The chancellor ultimately ordered Greg to pay child support of $2,000 per month. The chancellor also ordered Greg to maintain health insurance for the children and ordered the parties to each pay fifty percent of all out-of-pocket medical expenses.

¶14. The chancellor next divided the marital estate. However, he began by noting that because of the prenuptial agreement, there was "no marital estate, with the exception of the contents of the marital home which were purchased during the marriage." In February 2014, Sara moved out of the marital home[6] to a house that her father had purchased.[7] Sara testified that when she moved out of the marital home, she took property she owned prior to the marriage, property that had been gifted to her, and some property that she and Greg had purchased during the marriage. She testified that with respect to marital property, "she tried to take one item and leave a similar item," e.g., she took one couch and left one couch. Sara testified that she wanted nothing else from the marital home. She asked the chancellor to award her only those items in her possession. After discussing the *Ferguson* factors and

_____

[6] As noted above, Sara and the children remained in the marital home for about ten months after she filed for divorce. A temporary order provided that she and Greg should have separate bedrooms and bathrooms and that neither party should enter the other party's bedroom or bathroom without permission. However, the arrangement proved unworkable. Sara would wake up in the middle of the night to find Greg "standing over" her, "and he would say things like it would do you and I and the children a lot of good if we could have a little intimacy." Sara eventually installed a deadbolt on her bedroom door to keep Greg out.

[7] The property was originally conveyed to Sara and her parents as joint tenants with rights of survivorship. However, Sara was later removed from the title.

relevant facts,[8] the chancellor granted Sara's request, finding that it resulted in a "roughly" equal division of the marital assets and a "fair and equitable distribution of the marital estate," as defined by the prenuptial agreement.[9]

¶15. Next, the chancellor addressed alimony, noting that the parties' prenuptial agreement did not address or prohibit alimony. After discussing the *Armstrong* factors and relevant facts,[10] the chancellor awarded Sara lump-sum alimony in the amount of $250,000, with $125,000 payable on or before April 1, 2020, and the remainder payable in sixty monthly installments of $2,083.33. The chancellor also awarded Sara rehabilitative alimony of $1,500 per month for thirty months. The chancellor denied Sara's request to require Greg to pay for her health insurance for three years.

¶16. The chancellor next addressed Sara's request for attorneys' fees. During trial, Greg moved to exclude the evidence and testimony presented by Sara's two attorneys regarding attorneys' fees, arguing that exclusion was appropriate due to Sara's late disclosure of these witnesses and supporting documentation. The chancellor denied Greg's motion and objection. The chancellor ordered Greg to pay Sara $200,000 for attorneys' fees within

---

[8] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

[9] Greg alleged that Sara had taken many valuable items that he had purchased during the marriage. He provided values for the items in a document titled "Property Purchased By Greg During Marriage To Sara," and he requested "credit" for the value of the items Sara had taken. However, the chancellor found that Greg's testimony was "not credible." For example, Greg claimed that he had purchased three particular paintings during the marriage and that their total value was $4,000. In fact, Sara or her mother had painted all three of the paintings, including one that Sara's mother painted of Sara when Sara was only eight years old. The chancellor provided other examples of overstated values in Greg's document.

[10] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

ninety days. In so doing, the chancellor began by summarizing the testimony and evidence supporting his decision that "Sara was unable to pay her attorneys' fees" and that "Greg is able to pay Sara's attorneys' fees, as a result of his separate, non-marital property." In determining the amount of attorneys' fees, the chancellor analyzed each of the *McKee* factors[11] and determined that "the total attorneys' fees are reasonable, necessary, fair, and reflect the actual work performed."

¶17. Greg filed a motion to alter or amend the judgment or for a new trial pursuant to Mississippi Rule of Civil Procedure 59. Greg requested that the chancellor reconsider his awards of child support, alimony, and attorneys' fees. Greg argued that the chancellor had overstated his income and erred by not imputing income to Sara. Greg also argued that he did not have the means to make the payments the chancellor had ordered. Finally, Greg claimed that his financial condition had worsened during the two-plus years since the end of the trial, and he asked to reopen the record to allow him to present additional information regarding his financial condition.

¶18. Following a hearing, the chancellor denied Greg's motion to alter or amend the judgment or for a new trial. Greg then filed a notice of appeal.

**ANALYSIS**

¶19. On appeal, Greg argues that the chancellor erred (1) in setting child support, (2) by not imputing income to Sara, (3) in awarding alimony, (4) by denying his motion in limine to exclude evidence and testimony regarding attorneys' fees, (5) in awarding attorneys' fees,

---

[11] *McKee v. McKee*, 418 So. 2d 764, 797 (Miss. 1982).

and (6) by denying his request in his Rule 59 motion to introduce additional evidence regarding his financial condition.

¶20.   "[W]e will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Briggs v. Hughes*, 316 So. 3d 193, 198 (¶20) (Miss. 2021) (internal quotation marks omitted).  Orders setting child support, awarding alimony, and awarding attorneys' fees are subject to an abuse-of-discretion standard of review.  *See, e.g.*, *Clausel v. Clausel*, 714 So. 2d 265, 266 (¶6) (Miss. 1998) (child support); *Layton v. Layton*, 181 So. 3d 275, 279-80 (¶10) (Miss. Ct. App. 2015) (alimony and attorneys' fees).  We also review evidentiary rulings and the denial of a Rule 59 motion (based on new evidence) only for an abuse of discretion.  *See, e.g.*, *In re Est. of Walker*, 331 So. 3d 553, 559 (¶22) (Miss. Ct. App. 2021) (evidentiary rulings); *Hunt v. Allen*, 291 So. 3d 1125, 1131 (¶¶13-15) (Miss. Ct. App. 2020) (Rule 59 motion).  "Pure questions of law are reviewed de novo." *Layton*, 181 So. 3d at 279 (¶10).

### I.    Child Support

¶21.   Mississippi's child support guidelines establish a "rebuttable presumption" that the non-custodial parent should pay twenty-two percent of the parent's adjusted gross income for the support of three children.  Miss. Code Ann. § 43-19-101(1) (Rev. 2021).  While a chancellor must begin by applying the statutory guidelines, "an award of child support is a matter within the discretion of the chancellor and . . . will not be reversed unless the

10

chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion." *Clausel*, 714 So. 2d at 266 (¶6). "Furthermore, the process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's review." *Id.* at 266-67 (¶6) (brackets and internal quotation marks omitted).

¶22. The chancellor in this case ordered Greg to pay $2,000 per month for the support of his three children. That amount is twenty-two percent of an adjusted gross income of approximately $9,091 per month. Greg alleges that the chancellor ordered him to pay too much for child support because his final Uniform Chancery Court Rule 8.05 financial statement reported his net monthly income as only $4,347.66.

¶23. The chancellor found that Greg's Rule 8.05 statement understated his income. At all relevant times, Greg's primary reported income was the salary he received from Lexus Homes Inc. Greg was the sole shareholder of Lexus Homes, a homebuilder. As the corporation's sole shareholder, Greg decided what salary to pay himself. From at least June 2015 through the trial in December 2017, Greg claimed that Lexus Homes paid him a salary of $3,334 per month. However, Greg provided no evidence regarding *Lexus Homes's* income. As the chancellor stated, "Greg claimed that he produced all financial documents and tax returns for his businesses," but "Sara, who familiarized herself with every document in this case, said he did not produce these documents and tax returns." Sara attempted to obtain the documents from the couple's accountant, Robert Parker, but Parker refused. Sara then subpoenaed the records, but Greg filed a motion to quash, arguing that Sara had no right

11

to obtain the tax returns of Lexus Homes or any of his other businesses because they were his separate properties pursuant to the parties' prenuptial agreement. It does not appear that Greg's motion to quash was ever set for a hearing. In any event, the record on appeal includes only Greg's personal tax returns and not any returns for Lexus Homes or Greg's other businesses. Greg's Rule 8.05 statement disclosed that he was the sole owner or held a fifty percent interest in sixteen corporations and LLCs in addition to Lexus Homes. However, Greg's Rule 8.05 statement simply stated "not sure" regarding the value of all seventeen entities, and Greg provided no evidence at trial regarding those entities' earnings. Some of Greg's businesses received rental income from residential and commercial leases. However, Greg claimed, without direct evidentiary support, that he had no rental income to report because his rental properties' expenses exceeded their revenues.

¶24. The chancellor also noted that Greg's Rule 8.05 statements appeared to be inconsistent with prior representations he had made to banks in loan applications. For example, Greg's December 2017 Rule 8.05 statement claimed total assets of $1,518,928.88, but as recently as July 2014, Greg had represented to a bank that he had total assets of $5,711,200.

¶25. The chancellor also pointed to Greg's lifestyle and spending habits as evidence of additional income. Greg's December 2017 Rule 8.05 statement showed monthly living expenses and installment payments totaling $10,596.49, which did not include his temporary child support payments or any legal fees. Greg's May 2017 Rule 8.05 statement showed monthly living expenses and installment payments totaling $13,614.09, which included his temporary child support payments but no legal fees. Yet there was no evidence that Greg

was going into debt to meet his expenses. Therefore, Greg's ability to pay these expenses permitted the inference that he has sufficient income to pay them. *Williams v. Williams*, 264 So. 3d 722, 727 (¶14) (Miss. 2019) ("[A] court may impute income to a payor whose reported income is clearly inadequate to support his or her actual lifestyle."); *accord* Deborah H. Bell, *Bell on Mississippi Family Law* § 13.04[5][c], at 504 (3d ed. 2020); *see also Hornsby v. Hornsby*, 353 So. 3d 507, 512-13 (¶¶16-19) (Miss. Ct. App. 2022) (affirming chancellor's finding that child support payor's spending habits and lifestyle indicated that he had sufficient income to continue to pay his current child support, notwithstanding payor's claims of a reduction in income).

¶26. We also note that even the evidence Greg submitted in support of his Rule 59 motion to alter or amend the judgment or a new trial shows that his Rule 8.05 statement understated his income. Charles Rafferty, a certified public accountant, submitted a report and testified that Greg's "discretionary cash flow" for 2017 was $87,582 per year.[12] As defined by Rafferty, Greg's "discretionary cash flow" is equivalent to his pre-tax income. Greg's December 2017 Rule 8.05 statement showed a pre-tax income of only $5,497 per month or $65,964 per year. Thus, according to Greg's own evidence, his December 2017 Rule 8.05 statement understated his 2017 pre-tax income by $21,618.

¶27. In summary, substantial evidence supports the chancellor's finding that Greg's Rule 8.05 statement understated his adjusted gross income. By ordering Greg to pay child support of $2,000 per month, the chancellor implicitly found that Greg's actual adjusted gross income

---

[12] Greg paid Rafferty $7,000 for his report and testimony in support of Greg's motion to alter or amend the judgment or for a new trial.

13

from all sources was approximately $9,091 per month.[13] Substantial evidence also supports that finding. *See Williams*, 264 So. 3d at 727 (¶14) ("[A] court may impute income to a payor whose reported income is clearly inadequate to support his or her actual lifestyle."); *accord* Bell, *supra*, § 13.04[5][c], at 504. Therefore, we find no reversible error in the chancellor's determination of child support.

## II.    Imputed Income

¶28.    Greg argues that the chancellor should have "imputed income" to Sara based on evidence that her father helped her pay for her expenses, including attorneys' fees. Greg argues that the chancellor erred by failing to consider Sara's father's assistance as imputed income for purposes of both child support and alimony. Greg cites *Houston v. Houston*, 121 So. 3d 283, 292 (¶28) (Miss. Ct. App. 2013), which held that the chancellor did not err by finding that a wife's income was $3,000 per month based on evidence that "her parents had consistently provided her with an 'allowance' of between $2,000 and $4,000 per month for the entire duration of [the parties'] marriage." Greg also cites *Huseth v. Huseth*, 135 So. 3d 846, 856 (¶¶27-28) (Miss. 2014), which held that the chancellor "may have been correct" to impute income to the husband because his employer—his parents' business—paid a number of his regular living expenses for him. However, the supreme court in *Huseth* remanded the

---

[13] *See* Miss. Code Ann. § 43-19-101(1) (22% of $9,090.90 equals $2,000). The chancellor did not make an express finding regarding the precise amount of Greg's adjusted gross income. However, given that Greg's own evidence regarding his income and financial condition was conflicting and incomplete, Greg "can hardly complain" about any lack of specificity in the chancellor's findings. *Peters v. Peters*, 906 So. 2d 64, 71 (¶32) (Miss. Ct. App. 2004) ("[G]iven Michael's lack of candor in describing his financial condition, he can hardly complain now about possible inaccuracies in the income amount used by the chancellor in computing the child support award.").

case for more detailed findings regarding the husband's imputed income. *Id.* at (¶28).

¶29. This case is readily distinguishable from *Houston* and *Huseth*. Sara's father does not provide her with a regular "allowance" or pay her expenses as a form of compensation for employment. Rather, the evidence showed that Sara's father paid her expenses from time to time during the marriage when Greg unreasonably refused to pay for car repairs, medical bills, or other necessities for Sara's children. Sara's father has also helped her after the parties' separation, including by loaning her money to pay her attorneys. Sara testified that she "owe[d]" her father the attorneys' fees he had paid for her. Sara's father has no obligation to provide this assistance, and it could stop at any time. Indeed, Sara testified that her father's financial assistance had put a financial strain on her parents.

¶30. In *Smith v. Smith*, 318 So. 3d 484, 494-95 (¶¶30-34) (Miss. Ct. App. 2021), this Court affirmed a chancellor's decision declining to impute income to an ex-wife based on her father's gifts and financial assistance. The chancellor found that it would be inappropriate to impute income to the ex-wife because her father was under no obligation to make the gifts, and the gifts could "cease at any moment." *Id.* 495 (¶34). We affirmed on that issue, holding that the chancellor's finding was "supported by substantial evidence." *Id.*

¶31. Similarly, in *Robinson v. Robinson*, 554 So. 2d 300, 305 (Miss. 1989), the supreme court held that a wife's receipt of "periodic gratuities from her father" did not call for a reduction in the husband's separate maintenance or child support. The supreme court reasoned that the husband could not avoid his obligations "by showing that [his wife's] father will probably see that [she] does not suffer." *Id.* (quoting *McNeil v. McNeil*, 127 Miss. 616,

15

626, 90 So. 327, 329 (1922)).

¶32. Likewise, substantial evidence supports a finding that the assistance that Sara received from her father consisted of mere "gratuities" that could stop at any time. Therefore, the chancellor did not clearly err by declining to impute income to Sara.

### III. Alimony

¶33. Greg next argues that the chancellor erred by awarding alimony. The chancellor awarded Sara $250,000 in lump-sum alimony, with $125,000 payable within one month and the remainder payable in sixty monthly installments of $2,083.33. The chancellor also awarded Sara rehabilitative alimony of $1,500 per month for thirty months. The parties' prenuptial agreement did not prohibit an award of alimony. However, Greg argues that the amounts awarded by the chancellor exceed his ability to pay.

¶34. Alimony should be considered if, after the parties' assets are equitably divided, there are not "sufficient assets to provide for both parties," and one party is left with "a deficit." *Carter v. Carter*, 98 So. 3d 1109, 1112 (¶8) (Miss. Ct. App. 2012). By "deficit," we mean when a spouse does not have "sufficient resources and assets to meet his or her needs and living expenses." *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013).

¶35. "Periodic alimony is awarded on the basis of need, generally in monthly installments." *Stroh v. Stroh*, 221 So. 3d 399, 412 (¶44) (Miss. Ct. App. 2017). "It has no fixed termination date but automatically terminates upon the remarriage of the recipient or death of the payor." *Id.* "It can be modified or terminated in the event of a material change of circumstances for either party." The chancellor must consider the *Armstrong* factors in determining whether

16

to award periodic alimony and the amount of the award. *Id.*

¶36.    Lump-sum alimony "is a fixed and irrevocable amount, used either as alimony or as a part of property division." *Smith v. Little*, 834 So. 2d 54, 58 (¶10) (Miss. Ct. App. 2002). It may be payable as a single, lump sum or in fixed periodic installments. *Id.* "[W]hen 'lump-sum alimony is awarded as a mechanism to equitably divide the marital assets, then chancellors may conduct their analysis under the *Ferguson* factors.'" *Lewis v. Pagel*, 172 So. 3d 162, 176 (¶29) (Miss. 2015) (quoting *Davenport v. Davenport*, 156 So. 3d 231, 241 (¶34) (Miss. 2014)). However, "when the chancellor awards lump-sum . . . alimony after equitably dividing the estate, the chancellor should consider the *Armstrong* factors." *Id.* In that circumstance, the chancellor has discretion to award "lump-sum [alimony] instead of periodic alimony." *Pearson v. Pearson*, 761 So. 2d 157, 166 (¶28) (Miss. 2000); *accord Stroh*, 221 So. 3d at 414 (¶49).

¶37.    Finally, rehabilitative alimony is similar to periodic alimony but includes a "time limitation" so that it is payable only for a "fixed period." *Hubbard v. Hubbard*, 656 So. 2d 124, 129-30 (Miss. 1995) (emphasis omitted). Like periodic alimony, rehabilitative alimony "is modifiable" and vests only as it accrues. *Id.* at 130. Its purpose is "to provide temporary support for a spouse who may become employed after a period of training or job search." Bell, *supra*, § 9.02[3][a], at 269. "Rehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home. Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient." *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶15) (Miss. 2003). "An award of rehabilitative alimony is based on the

same factors used to award permanent alimony," i.e., the *Armstrong* factors. Bell, *supra*, § 9.02[3][a], at 270.

¶38.    The chancellor in this case properly considered the *Armstrong* factors in determining the appropriate types and amounts of alimony.  The *Armstrong* factors are the following:

1.    The income and expenses of the parties;

2.    The health and earning capacities of the parties;

3.    The needs of each party;

4.    The obligations and assets of each party;

5.    The length of the marriage;

6.    The presence or absence of minor children in the home, which may require that one or both of the parties either pay or personally provide child care;

7.    The age of the parties;

8.    The standard of living of the parties, both during the marriage and at the time of the support determination;

9.    The tax consequences of the spousal support order;

10.    Fault or misconduct;

11.    Wasteful dissipation of assets by either party; or

12.    Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong*, 618 So. 2d at 1280.

¶39.    The chancellor must make findings of fact regarding the *Armstrong* factors. *See Lowrey v. Lowrey*, 25 So. 3d 274, 280 (¶7) (Miss. 2009).  When the chancellor applies the

proper legal standard, "[i]t is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor." *Gutierrez v. Gutierrez*, 233 So. 3d 797, 811 (¶33) (Miss. 2017) (quoting *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1995)). "As a result, the chancellor is given wide latitude in determining an alimony award." *Id.* "We will not disturb the chancellor's decision on alimony on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error." *Creekmore*, 651 So. 2d at 517.

¶40. The chancellor in this case made specific findings of fact regarding each of the *Armstrong* factors. Of note, the chancellor incorporated his prior discussion of Greg's income in connection with the issue of child support, and he again found that Greg's "reported income [was] inaccurate" based on his lifestyle, spending habits, and other evidence. The limited and conflicting evidence Greg produced did not provide "a clear picture" of his assets, debts, and businesses. But the chancellor found that Greg's income was higher than the amount reported on his Rule 8.05 statement. Greg claimed monthly expenses of $10,596.49.

¶41. Sara had no income, received $300 per month in child support for her first child (from a different father), and also received financial support from her parents. Prior to the marriage, she had worked as an assistant manager at a bank, earning $35,000 per year. She would have liked to go back to work but needed flexible hours so that she could care for her children. Sara claimed combined monthly expenses for herself and her children of approximately $7,300 per month; thus, she clearly had a "deficit" justifying an award of

19

alimony. She had no significant assets other than the personal property she received in the divorce.

¶42. The chancellor noted that "[t]he parties had a short marriage," having been married just less than five years when Sara filed for divorce. Regarding fault and misconduct, the chancellor incorporated his findings from his opinion granting Sara a divorce on the grounds of habitual cruel and inhuman treatment and, alternatively, constructive desertion. *See supra* ¶10; *Gerty*, 265 So. 3d at 133 (¶43) ("The law is settled that a chancellor *must* consider fault when determining alimony.").

¶43. In contrast to Greg's fault, the chancellor found that "Sara contributed greatly [to the marriage] . . . by caring for the children and taking care of the household," and she did so "at the expense of pursuing a career." The chancellor stated that "Sara has a college education and is capable of reentering the workforce; however, her ability to work typical working hours is limited because she has four children." If she took a job "with a typical work schedule," she would incur "considerable childcare costs."

¶44. Based on the chancellor's findings under *Armstrong*, the chancellor found that Greg should pay lump-sum alimony payable in installments over five years and rehabilitative alimony for thirty months, as described above. On appeal, Greg argues that the chancellor erred because—based on the income he reported on his own Rule 8.05 statement—he cannot afford to pay the amounts ordered. However, just as with child support, a chancellor considering a request for alimony may find that a payor's true income exceeds his reported income based on evidence of the payor's spending habits and ability to pay expenses. *See*

20

*Carroll v. Carroll*, 98 So. 3d 476, 483 (¶23) (Miss. Ct. App. 2012); *Brooks v. Brooks*, 76 So. 3d 215, 221 (¶22) (Miss. Ct. App. 2011); *Sheffield v. Sheffield*, 55 So. 3d 1142, 1146-47 (¶18) (Miss. Ct. App. 2011). We have already held in Part I that substantial evidence supports the chancellor's finding that Greg's Rule 8.05 statement did not accurately reflect his income and that Greg earned and had the ability to pay more than was disclosed on his Rule 8.05 statement. For the same reasons, we find that substantial evidence supports the chancellor's findings as they relate to alimony, and we affirm the chancellor's alimony awards.

## IV. Motion in Limine to Preclude Sara's Attorneys from Testifying Regarding Sara's Attorneys' Fees and Objection to Supporting Documentation

¶45. Sara sought attorneys' fees in her complaint and also filed a separate motion for temporary attorneys' fees on April 13, 2017. At trial in December 2017, Sara sought to present evidence in support of her request through the testimony of two of her attorneys, William Wright and Alicia Baladi. Greg moved, ore tenus, to preclude their testimony, arguing that Sara failed to timely disclose that they would testify at trial. Greg relied on a May 2017 scheduling order that directed the parties to "complete limited discovery regarding financial information, assets, and liabilities no later than October 31, 2017." During discovery, Greg served an interrogatory that requested the names of persons Sara might call to testify at trial. Sara's initial responses did not identify Wright or Baladi. Sara supplemented her responses a day before trial, identifying Wright and Baladi. Without elaboration, Greg asserted that he would be "severely prejudiced" if Sara's attorneys were

21

allowed to testify.

¶46.　In response to Greg's motion in limine, Sara argued that there was no unfair surprise because Greg knew that she was seeking attorneys' fees from the outset of the case. The chancellor held that "considering the totality of circumstances at this time the Court will deny [Greg's] Motion in Limine."

¶47.　Near the end of the portion of the trial on financial matters, Greg's counsel also objected to the admission of a one-page "Client Ledger Report" summarizing $377,490.14 in fees and expenses that Wright's firm billed to Sara and Baladi's records of $98,000.05 in fees that she had billed to Sara as being outside the window of discovery set by the May 2017 scheduling order. In response, Sara's counsel explained that the Wright documentation he sought to use with respect to the attorneys' fees was merely an update to one produced to Greg's counsel thirteen days before because he was unable to provide a complete attorneys' fee statement until the end of trial. The chancellor overruled Greg's objection.

¶48.　On appeal, Greg challenges the chancellor's denial of his ore tenus motion in limine to exclude the testimony of Wright and Baladi and other evidence pertaining to Sara's attorneys' fees. We find no abuse of discretion in the chancellor's denial of his motion or objections.

¶49.　While Mississippi Rule of Civil Procedure 26(f)(1)(A) requires a party to supplement his discovery "in a timely manner," the supreme court has specifically noted that it "has laid down no hard and fast rule as to what amounts to seasonable supplementation or amendment of answers." *Eastover Bank for Sav. v. Hall*, 587 So. 2d 266, 272 (Miss. 1991). Rather,

22

timeliness (formerly referred to as "seasonableness") "must be determined on a case by case basis looking at the totality of the circumstances surrounding the supplemental information the offering party seeks to admit." *AmSouth Bank v. Gupta*, 838 So. 2d 205, 220 (¶51) (Miss. 2002). In this regard, "[t]he predominant concern is whether there has been prejudice to [the objecting party]. An abuse of discretion on the part of the lower [court] would be difficult to find otherwise." *Hall*, 587 So. 2d at 272. "[F]or a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Holladay v. Holladay*, 776 So. 2d 662, 672 (¶40) (Miss. 2000). "Error is reversible only where it is of such magnitude as to leave no doubt that the appellant was unduly prejudiced." *Id.*; *accord Gupta*, 838 So. 2d at 220 (¶51) (finding no abuse of discretion in allowing expert's testimony regarding value of acreage where expert's report was not corrected until "the eve of trial" because the court found opposing party had no genuine reason to be "startled" by the correction); *Hall*, 587 So. 2d at 272 (finding no abuse of discretion in trial court's allowing two witnesses not identified until nine days before trial to testify, where, among other reasons, they were lay, not expert, witnesses, thus making it easier to prepare for their testimony, and no prejudice was found); *Motorola Commc'ns & Elecs. Inc. v. Wilkerson*, 555 So. 2d 713, 718 (Miss. 1989) (finding no abuse of discretion in trial court's allowing an expert witness to testify who was disclosed ten days prior to trial, noting that "the issue upon which [the expert] was to testify was narrow and impliedly could be quickly and easily dealt" in time for trial).

¶50.    Under the totality of the circumstances in this case, we do not find that Greg was

"unduly prejudiced" here. First, Greg knew from the outset of this case that Sara was seeking attorneys' fees. As noted, Sara's complaint included a request for attorneys' fees, and Sara filed a separate "Motion for Temporary Attorneys' Fees and Court Costs" on April 13, 2017, thus further alerting Greg's counsel to the fact that she would be seeking attorneys' fees in this case. Second, Wright and Baladi were testifying as fact witnesses, not experts, thus making it easier for Greg's counsel to prepare for cross-examination. This is particularly true here, where the record reflects that in April 2016, Wright testified regarding attorneys' fees incurred in relation to certain discovery and contempt matters in this case. Greg's counsel did not object to his testimony at that time. Indeed, the record reflects that Greg's counsel thoroughly cross-examined Wright with respect to his fees and the documentation available at that time. Third, the identity of Sara's counsel was known to Greg, and certainly there could be no "unfair surprise" in Sara calling her own lawyers to testify as to her attorneys' fees and the supporting documentation. And although Baladi's statements were produced the night before trial, Wright's billing summary was simply an updated version of one produced thirteen days before trial. The updated version necessarily had to be submitted closer to trial to include fees incurred to that point. For these reasons, we find no reversible error in the chancellor allowing the testimonies of Wright and Baladi or the supporting documentation.

## V. Attorneys' Fees Award

¶51. As an initial matter, "[a]n award of attorney's fees is appropriate in a divorce case where the requesting party establishes an inability to pay." *Tatum v. Tatum*, 105 So. 3d 1141,

24

1144 (¶9) (Miss. Ct. App. 2012). The chancellor in this case noted that Sara's father loaned her the money to pay the attorneys' fees that had been paid on her case thus far. The chancellor further observed that "[a]s a result of the parties' Prenuptial Agreement, Sara was not awarded any valuable assets in this divorce case. She is a stay-at-home mom. . . . While she receives child support, SNAP benefits, and subsidiary support from her father, she has no other sources of income and is not employed." Based on these factors, the chancellor found that "Sara is unable to pay her attorneys' fees." The chancellor also found that Greg was able to pay those fees.

¶52. On appeal, Greg asserts that there is no evidence that Sara had any legal obligation to pay her family back for any attorneys' fees paid by her father and thus no proof of her inability to pay them. However, Sara's testimony that she borrowed the money from her father is sufficient to support an award of attorneys' fees. *See Armstrong*, 618 So. 2d at 1282; *Layton*, 181 So. 3d at 288-89 (¶¶45-46). As such, we find this assertion is without merit and find no error in the chancellor's finding that Sara was unable to pay her attorneys' fees.

¶53. With respect to the amount of attorneys' fees, "the decision to award attorney's fees in a divorce proceeding is left to the sound discretion of the chancellor[.]" *Gilmer v. Gilmer*, 297 So. 3d 324, 340 (¶55) (Miss. Ct. App. 2020). However, "there must be evidence undergirding the chancellor's decision that a party is unable to pay her attorney's fees before an award can be made." *Id*. "Before granting or denying attorney's fees, a chancellor must apply the *McKee* factors." *Id*. at 339 (¶53). The *McKee* factors include:

25

(1) relative financial ability of the parties; (2) the skill and standing of the attorney employed, (3) novelty and difficulty of issues in the case, (4) the responsibility required in managing the case, (5) time and labor required, (6) the usual and customary charge in the community, and (7) whether the attorney was precluded from undertaking other employment by accepting the case.

*Id*. These factors are "strikingly similar to the factors set out in Miss. R. Prof. Conduct 1.5(a)."[14] *Tupelo Redevelopment Agency v. Gray Corp.*, 972 So. 2d 495, 521 (¶80) (Miss. 2007). They, in turn, are "virtually identical" to the "lodestar" factors recognized by the United States Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). *Id.* at 520-21 (¶78). "An award of attorney's fees must be supported by sufficient evidence for an accurate assessment of fees." *Watts v. Watts*, 99 So. 3d 751, 764 (¶39) (Miss. Ct. App. 2012). "We review the reasonableness of the award only for an abuse of discretion, and we will not reverse unless the award is manifestly erroneous or amounts to a clear or unmistakable abuse of discretion." *Brown v. Hewlett*, 281 So. 3d 189, 199-200 (¶40) (Miss. Ct. App. 2019).

¶54. In reviewing Sara's request for attorneys' fees, the chancellor heard testimony from

[14] Rule 1.5(a) provides:

The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

Sara and Sara's attorneys, Wright and Baladi. The chancellor also reviewed the following documents: (1) a one-page billing report summarizing $377,490.14 in fees and expenses that Wright's firm billed to Sara, and (2) Baladi's records of $98,000.05 in fees that she billed to Sara, which included individual billing entries with descriptions of the work performed. Although Wright's billing document showed only the amounts billed with no descriptions of the work performed, Wright testified regarding the fees and expenses his firm billed to Sara.

¶55. Wright testified that the total number of hours his firm billed to Sara was 1,569. Wright also testified about his firm's hourly rates for attorneys and paralegals, and Wright informed the chancellor that the average hourly rate for Sara's case was $228.45. Wright explained that his firm typically discounts the number of hours billed to a client, and he estimated that in Sara's case, his firm did not charge her for approximately fifty to seventy-five hours of work.

¶56. Wright testified that he had practiced law for forty-three years and that he was the lead attorney for the management of Sara's case, which he described as a "monumental task." Wright discussed his responsibilities as lead attorney, which included coordinating approximately fifteen days of hearings. He noted that the case had 91 filed motions, four telephonic hearings, and nine contempt petitions. Wright also addressed the amount of work that was required over the course of the case, in part due to Greg changing lawyers multiple times, explaining that "whenever a new attorney gets involved, it's a new round of motions and requests for documents." Additionally, Wright expressed to the chancellor the burden

27

that Sara's case had placed on his firm, testifying that due to the time and resources involved in representing Sara, his firm was precluded from accepting other work and also had to decline clients.

¶57. Baladi provided detailed records regarding her work on the case, including individual billing entries with descriptions of the services performed. Baladi's records show that she worked on the case from March 2015 through trial, that her billing rate was $225 per hour, that she billed Sara for attorneys' fees totaling $98,000, and that Sara currently owed $27,950. Baladi, a sole practitioner, testified that she began working on the case in March 2015 "to serve as part of the team," and her "emphasis was on custody."

¶58. The chancellor ultimately awarded Sara $200,000 in attorneys' fees. In so doing, the chancellor applied the *McKee* factors and set forth his findings with respect to each factor. With respect to the "novelty and difficulty of the questions" factor, for example, the chancellor observed that

> [t]his case has not been a typical divorce case, as it has been multi-faceted with issues related to a Prenuptial Agreement, fault-based divorce grounds, child custody, visitation, child support, property division, alimony, awards of attorneys' fees, and numerous contempt filings. It must be noted that Sara has filed nine petitions for contempt against Greg for his failures and refusals to abide by the Court's orders.

¶59. With respect to the degree of responsibility involved, the chancellor found it was relevant that "[t]he issues in this case have required the attorneys to do extensive legal research and engage in various forms of discovery." He further observed that "[w]ith the many pleadings filed in this case and numerous issues involved, representation of both Sara and Greg has been a vast responsibility that has spanned over approximately five years." The

28

chancellor noted the time and labor involved and found that the rates charged were "typical to the rates charged in the community." Further, the chancellor found that "[t]he attorneys in this case undoubtedly devoted a great amount of their time to this case and, as a result, were unable to work on other cases." The chancellor ultimately found that "the total attorneys' fees are reasonable, necessary, fair, and reflect the actual work performed."

¶60. Greg asserts that Sara furnished insufficient evidence and insufficient explanation to support the chancellor's award of attorneys' fees and that the chancellor erred in awarding $200,000 in attorneys' fees without any calculation or specific findings regarding the number of hours reasonably expended on Sara's case.

¶61. But this Court has found that substantial evidence in the record supported a chancellor's award of attorney's fees where an attorney presented only a summary of billing statements for fees incurred by the party and then testified regarding the fees. *Riley v. Heisinger*, 302 So. 3d 1243, 1263 (¶43) (Miss. Ct. App. 2020). This Court has also held that "[e]stimates may support an award in some circumstances[,] if the estimates clearly explain the method used in approximating the hours consumed on a case." *Watts*, 99 So. 3d at 764 (¶39) (internal quotation marks omitted).

¶62. In *Watkins v. Watkins*, 748 So. 2d 808, 813 (¶13) (Miss. Ct. App. 1999), the husband argued that because the wife failed to introduce into evidence an itemized statement of services rendered by her attorney, the reasonableness and necessity of the chancellor's attorney's fee award could not be determined. This Court disagreed, explaining that the wife's attorney testified regarding how long he had practiced law, the general hourly fee he

29

charged, and the number of hours he worked on the wife's case. *Id*. at (¶14). The chancellor also found that the wife demonstrated by credible evidence that she could not afford her attorney's fees. *Id*. Upon review, this Court found that the chancellor correctly applied the *McKee* factors and accordingly affirmed the award of attorney's fees. *Id*.

¶63. Additionally, in *Brown*, 281 So. 3d at 200 (¶41), the chancellor granted the husband's request for $5,000 in attorney's fees based on the wife's contempt. The chancellor found that the amount was "more than reasonable and probably not enough." *Id*. On appeal, the wife argued that the chancellor should have insisted on an itemized billing statement and additional testimony from the husband's attorney, rather than accepting the request at "face value." *Id*. Upon review, this Court found no abuse of discretion in the chancellor's award of attorney's fees, explaining that in cases "in which a court is authorized to award reasonable attorneys' fees, the court may make the award based on the information already before it and the court's own opinion based on experience and observation." *Id*. at (¶42) (quoting Miss. Code Ann. § 9-1-41 (Rev. 2014)). This Court further explained that "[i]n such cases, the court may determine that there is no need for the requesting party to put on additional proof as to the reasonableness of the amount sought." *Id*. (internal quotation marks omitted). This Court also held that "when the record as a whole shows that the amount awarded was not unreasonable, we will affirm." *Id*.; *see Savell v. Manning*, 325 So. 3d 1208, 1223 (¶54) (Miss. Ct. App. 2021). In determining that the attorneys' fees were reasonable in this case, the chancellor likewise based his decision upon his own "experience and observation," as well as the information before him, taking into account the numerous

issues and pleadings involved in the case that spanned over approximately five years. We find no error in the chancellor doing so here.

¶64. Further, when "a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Id*. at (¶40). In the present case, the chancellor's judgment reflects that in awarding attorneys' fees to Sara, he took into consideration that Sara filed nine contempt petitions against Greg. Although Greg was found in contempt only once prior to the final judgment, "this Court has upheld awards of attorney's fees in contempt actions even where there was no specific evidence regarding the attorney's fees that the moving party incurred related to the contempt." *Dixon v. Olmstead*, 296 So. 3d 227, 235-36 (¶37) (Miss. Ct. App. 2020) (internal quotation marks omitted); *see also McAdams v. McAdams*, 261 So. 3d 157, 165 (¶29) (Miss. Ct. App. 2018) (affirming a chancellor's award of $1,000 in attorney's fees even where "there was no specific evidence regarding the attorney's fees that [the wife] incurred related to [the husband's] contempt").

¶65. For the foregoing reasons, we find that the amount of attorneys' fees awarded was not unreasonable and was supported by substantial evidence. Accordingly, we affirm the award.

## VI. Rule 59 Motion

¶66. Finally, Greg argues that the chancellor denied his Rule 59 motion to alter or amend the judgment or for a new trial. The trial in this case concluded in December 2017. Greg's motion asserted that in 2019, he became employed by a bank with an annual salary of approximately $60,000. Greg did not provide any documentation regarding his employment

or state the specific date when he started his job at the bank, but based on other assertions in his motion, it appears that Greg worked for the bank for at least seven months in 2019.[15] The chancellor denied the motion and declined to allow testimony or other evidence in support of the motion.[16] On appeal, Greg argues that the chancellor erred by denying his motion and by declining to consider "new evidence" regarding his new job and the alleged change in his financial circumstances.

¶67.    In support of his argument on appeal, Greg cites one case, *Garrison v. Courtney*, 304 So. 3d 1129 (Miss. Ct. App. 2020), a divorce and child custody case involving a similar issue.  In *Garrison*, the husband filed a Rule 59 motion to reopen the judgment to present new evidence related to his post-trial change of employment.  *Id.* at 1157-58 (¶108).  Specifically, he wanted to show that his employer at the time of trial paid the entire cost of health insurance for the parties' minor children, but his new employer paid none of the cost of the children's coverage.  *Id.*  He further argued that the court should amend the judgment to require the wife to share the cost of health insurance.  *Id.*  The chancellor denied the motion.  *Id.* at 1137 (¶¶9-10).  On appeal, this Court stated,

> A motion for a new trial based on new evidence is an extraordinary motion, and the requirements of the rule must be strictly met.  The motion may not be granted unless (1) the evidence was discovered following the trial; (2) due diligence on the part of the movant to discover the new evidence is shown or

---

[15] Greg asserted that his 2019 W-2 tax form from the bank showed income of $36,310.60, which would equate to more than seven months at his alleged new salary.

[16] As noted above, Greg retained Charlie Rafferty to produce a report and testify in support of his motion.  Although the chancellor declined to consider Rafferty's testimony in support of Greg's Rule 59 motion, he allowed Rafferty to testify in support of Greg's inability-to-pay defense to a post-judgment contempt petition Sara filed.

> may be inferred; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; (5) the evidence is such that a new trial would probably produce a new result.

*Id.* at 1158 (¶109) (quoting *McNeese v. McNeese*, 119 So. 3d 264, 272 (¶20) (Miss. 2013)). In addition, we review a chancellor's denial of such a motion only for an abuse of discretion. *Id.* In affirming the chancellor's ruling, we noted that the trial in the case finally concluded in March 2018, the husband's change of employment occurred in September 2018, and the chancery court entered the final judgment on November 30, 2018. *Id.* at (¶110). Thus, although the husband's change of employment occurred after trial, he "had over two months while the divorce judgment was pending to notify the chancery court of the change in circumstances relating to his major medical insurance coverage." *Id.* at (¶111). We concluded that the chancellor did not abuse his discretion by denying the husband's motion because the husband could have presented the new evidence to the court prior to the entry of a final judgment. *Id.*

¶68. The same reasoning applies here. The chancellor entered the final judgment on February 24, 2020. As stated above, Greg's motion did not provide a specific date when he started his new job at the bank, but it appears that Greg worked for the bank for at least seven months in 2019. Thus, Greg had nine months or more to notify the chancery court of this change of circumstances prior to the entry of the final judgment. Because Greg did not present this new evidence to the chancery court in a timely fashion, we cannot say that the chancellor abused his discretion by denying Greg's post-judgment motion. *Id.*[17]

---

[17] The record in this case is voluminous, consisting of more than 600 docket entries, a 3,950-page transcript, and more than 2,000 pages of exhibits. The chancellor's 65-page

**CONCLUSION**

¶69. For the reasons addressed above, we find no abuse of discretion or manifest error in the judgment of the chancery court. Accordingly, we affirm.

¶70. **AFFIRMED.**

**BARNES, C.J., WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶71. I concur that the chancery court's rulings on child support and alimony should be affirmed. However, we should reverse and remand on the issue of attorneys' fees because the record and the chancellor's findings are insufficient to support an award of $200,000. Indeed, the record contains no specific evidence regarding more than eighty percent of the fees billed by Sara's attorneys, and the chancellor made no findings regarding the reasonableness of the hours expended by Sara's attorneys. For these and additional reasons discussed below, I respectfully dissent in part.

¶72. "[P]recedent requires that the assessment of attorney's fees be reasonable." *BellSouth Personal Commc'ns LLC v. Bd. of Supervisors of Hinds Cnty.*, 912 So. 2d 436, 445 (¶30)

---

final opinion and judgment is thorough, and we have no doubt that it required considerable time to review the record and draft an opinion addressing all remaining issues in the case. Nonetheless, the twenty-six-month delay between the trial and the final judgment is too long. But if Greg was concerned by the delay, he could and should have utilized Mississippi Rule of Appellate Procedure 15, which provides a procedural mechanism to require a decision from a trial court in a civil case that has been taken under advisement for more than six months.

(Miss. 2005). A trial judge has discretion to determine what constitutes a "reasonable" fee, but "a judge's discretion is not unfettered" and "must be predicated on facts." *Id.* at 445, 448 (¶¶30, 39). "Moreover, trial court judges must follow the appropriate procedure and make the requisite findings of fact necessary to insure a losing litigant is only made to compensate his adversary for fees and expenses which were reasonably incurred." *Id.* at 448 (¶39).

¶73.   Although the lead opinion only mentions it in passing, "[t]he [Mississippi] [S]upreme [C]ourt has adopted the 'lodestar' method of calculating reasonable attorney's fees[.]" *W-T Holdings LLC v. Gilchrist*, 299 So. 3d 808, 821 (¶47) (Miss. Ct. App. 2019) (Carlton, P.J., concurring in part and dissenting in part). The Supreme Court has held that "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation, multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services . . . ." *BellSouth Personal Commc'ns*, 912 So. 2d at 446-47 (¶35) (brackets and emphasis omitted). Therefore, "to determine a reasonable fee, [the Supreme] Court has directed trial courts to apply the 'lodestar method'—i.e., the number of hours reasonably expended, multiplied by a reasonable hourly rate . . . ." *Webster v. Miss. Dep't of Wildlife, Fisheries & Parks*, 257 So. 3d 277, 284 (¶31) (Miss. 2018).

¶74.   At trial, Sara attempted to offer evidence of her attorneys' fees through the testimony of two of her lawyers, William Wright and Alicia Baladi. Greg objected, arguing that Sara failed to timely disclose either as a potential witness. Greg also objected to the admission of (1) a one-page "Client Ledger Report" summarizing $377,490.14 in fees and expenses

35

billed by Wright's firm and (2) documentation of $98,000 in fees billed by Baladi. Baladi's records included individual billing entries with descriptions of the work performed, but Wright's document showed only gross amounts billed with no descriptions of the work performed. Greg objected to the records on the ground that he had specifically requested Sara's legal bills in discovery, but the documents were produced only shortly before trial. Indeed, Baladi conceded that she did not disclose her records until 4:38 p.m. on Sunday, the day before trial. Greg also objected to Wright's one-page document on the ground that he had requested copies of Sara's billing statements, but Sara objected and refused to produce billing statements from Wright's firm on the ground that the statements' descriptions of work performed allegedly contained privileged information.[18] The chancellor overruled Greg's objections and admitted the documents into evidence.

¶75. Wright's one-page document showed that his firm billed Sara a total of $377,490.14 for 1,569 hours of work and expenses. The document contains no detail regarding the work his firm performed. Wright testified that three or four attorneys at his firm and a paralegal had worked on the case, but the document does not show how much time any of them billed or what they did. It only shows gross dollar amounts billed and paid on various dates.

¶76. Baladi provided detailed records regarding her work on the case, including individual billing entries with descriptions of the services performed. Baladi's records show that she worked on the case from March 2015 through trial, her billing rate was $225 per hour, and

---

[18] Although Wright argued that his detailed billing statements were privileged, his co-counsel, Baladi, produced detailed descriptions of the work she performed. Greg also argued that Wright failed to produce a privilege log. *See* M.R.C.P. 26(b)(6)(A).

she billed Sara a total of $98,000.  Baladi, a sole practitioner, testified that she joined the case in March 2015 "to serve as part of the team," and her "emphasis was on custody."

¶77.    In addressing Sara's request for attorneys' fees, the chancellor made general findings regarding the *McKee* factors and found that Sara was unable to pay her attorneys' fees, that "her father ha[d] loaned her the money to pay the attorneys' fees that ha[d] been paid," and that Greg could afford to pay Sara's fees.  The chancellor also stated:

> During the pendency of this case, Sara has filed nine petitions of contempt against Greg, and hearings were conducted on some of these.  Greg's refusals to comply with the Court's orders has caused Sara's attorneys' fees to increase greatly. . . .

The chancellor found that Sara's "total attorneys' fees are reasonable, necessary, fair, and reflect the actual work performed."  The chancellor then found that Greg should pay Sara "$200,000 for attorneys' fees incurred by her as a result of this divorce case."

¶78.    On appeal, Greg argues that the award of attorneys' fees is not supported by substantial evidence because there is no detail concerning the hours expended by Wright's firm other than a one-page document showing that the firm billed Sara for more than 1,500 hours of unspecified lawyers and non-lawyers.  I agree.  Put simply, there is not a sufficient explanation or sufficient evidence in the record to support an award of $200,000 in attorneys' fees.  As stated above, our Supreme Court has held that "to determine a reasonable fee, . . . trial courts [are] to apply the 'lodestar method'—i.e., the number of hours reasonably expended, multiplied by a reasonable hourly rate . . . ." *Webster*, 257 So. 3d at 284 (¶31).  However, the chancellor in this case made no specific findings regarding the reasonableness of the hours expended by Sara's attorneys in this case.  Indeed, with respect to the work

performed by Wright's firm, it would have been impossible for the chancellor to make such findings because Wright provided no detail regarding the nature of their work—or even which lawyers or non-lawyers performed it. The chancellor erred by awarding $200,000 in attorneys' fees without any calculation or specific findings regarding the numbers of hours reasonably expended on the case. *Webster*, 257 So. 3d at 284-85 (¶¶31-33).

¶79. Moreover, Sara produced no evidence regarding the number of hours her attorneys expended on their unsuccessful challenge to her prenuptial agreement. The overwhelming majority of the fees billed by Wright's firm predate the October 2017 trial regarding the validity of the prenuptial agreement. Nonetheless, Sara provided no evidence regarding the amount of work performed or the fees bill related to that issue. Sara should have presented such evidence because "the results obtained" as a result of a lawyer's work are among the factors relevant to determining a reasonable fee under Rule 1.5. Miss. R. Prof. Conduct 1.5(a)(4); *see also Bay Point Props. Inc. v. Miss. Transp. Comm'n*, 304 So. 3d 606, 610 (¶14) (Miss. 2020) (emphasizing the importance of the "results-obtained factor[]" in the determination of "reasonable attorneys' fees"). The chancellor likewise did not address this issue in his opinion.

¶80. In addition, because the record contains no detail regarding the work performed by the lawyers and non-lawyers at the Wright firm, there is no way to determine whether either the Wright firm or Baladi billed for duplicative hours. In *McKee*, the Supreme Court stated that "[i]n determining an appropriate amount of attorneys fees, a sum sufficient to secure *one* competent attorney is the criterion by which we are directed." *McKee v. McKee*, 418 So. 2d

38

764, 767 (Miss. 1982) (emphasis added). The Court later held that "the general rule is that appropriate attorney fees should be awarded in an amount to secure one competent attorney," but a court may award fees for multiple attorneys when the evidence establishes that "there was nothing duplicative about the work performed." *Mabus v. Mabus*, 910 So. 2d 486, 490 (¶13) (Miss. 2005). In *Mabus*, the Court affirmed an award of fees for two attorneys because the Court was satisfied that the attorneys' testimony and itemized billing statements demonstrated that their hours were not duplicative and that their fees ($9,360 for one and $4,187.50 for the other) were reasonable and necessary. *Id.* at 490-92 (¶¶13-24). Here, in contrast, we have no detailed explanations for over 1,569 hours and $377,490.14 in fees and expenses.

¶81. In ruling on Sara's request for attorneys' fees, the chancellor also noted that Sara "*filed* nine petitions of contempt against Greg, and hearings were conducted on some of these." (Emphasis added). However, it appears that Greg was *found* in contempt only once prior to the final judgment. In February 2016, the chancellor found Greg in contempt because he had not paid for Sara's automobile repairs as required by the temporary order. The chancellor awarded Sara $1,000 in attorneys' fees for that contempt. Sara does not identify any other finding of contempt that could support any part of the $200,000 awarded to her in the final judgment. A trial court cannot award attorneys' fees for "prosecuting various contempt motions" in the absence of an actual *finding* of contempt. *Hensarling v. Hensarling*, 824 So. 2d 583, 593 (¶30) (Miss. 2002). "[T]he trial court must make a factual finding of contempt before attorney fees may be considered." *Id.* Because Greg was never

found in contempt on any other occasion, "it was erroneous for the chancellor to award attorney fees based on the motions for contempt." *Id.*[19]

¶82. The chancellor also stated that Sara had incurred attorneys' fees because of "Greg's refusals to comply with the Court's orders." However, the chancellor did not identify any orders that Greg refused to comply with. Nor did the chancellor make any specific findings that Sara had incurred attorneys' fees as a result of any alleged noncompliance.

¶83. In summary, the chancellor erred by awarding $200,000 in attorneys' fees without making any specific findings regarding the numbers of hours Sara's attorneys reasonably expended on the case. *Webster*, 257 So. 3d at 284-85 (¶¶31-33).[20] The chancellor also erred

---

[19] The lead opinion similarly relies on cases in which a party was "held in contempt," *ante* at ¶64, but fails to acknowledge that none of the attorneys' fees at issue in this appeal are attributable to an actual finding of contempt.

[20] The lead opinion cites a series of contempt cases in which we have affirmed comparatively small fee awards despite limited proof regarding the specifics of the attorney's work or bills. *See Riley v. Heisinger*, 302 So. 3d 1243, 1261-63 (¶¶76-84) (Miss. Ct. App. 2020) (affirming a total award of $8,000 for the successful prosecution of three different contempt petitions over a two-year period); *Dixon v. Olmstead*, 296 So. 3d 227, 235-36 (¶¶36-38) (Miss. Ct. App. 2020) (affirming an award of $1,000 for the successful prosecution of a contempt petition); *Brown v. Hewlett*, 281 So. 3d 189, 200 (¶43) (Miss. Ct. App. 2019) (affirming an award of $5,000 for the successful prosecution of a contempt petition where the contemnor's "persistent contempt of court" "required three hearings in chancery court and also forced [the petitioner] to retain counsel in Missouri"); *McAdams v. McAdams*, 261 So. 3d 157, 165 (¶29) (Miss. Ct. App. 2018) (affirming an award of $1,000 for the successful prosecution of a contempt petition); *Watkins v. Watkins*, 748 So. 2d 808, 813 (¶¶13-14) (Miss. Ct. App. 1999) (same). Such factually dissimilar cases are inapposite. A chancellor's own "experience and observation" regarding the appropriate fee and time required to prosecute a typical contempt petition may be sufficient to justify an award of $1,000 or even a few thousand dollars in such a case. Miss. Code Ann. § 9-1-41 (Rev. 2019). But a court cannot award *$200,000* without any evidence regarding the vast majority of hours expended and without making any findings regarding the number of hours reasonably expended.

by making such a substantial award without any evidence or findings regarding the amount of fees that Sara incurred pursuing her unsuccessful challenge to her prenuptial agreement. In addition, the chancellor should not have awarded attorneys' fees for both the Wright firm and Baladi without any showing that the hours they expended were reasonable, necessary, and non-duplicative. *McKee*, 418 So. 2d at 767; *Mabus*, 910 So. 2d at 490-92 (¶¶13-24). Finally, the chancellor erred by awarding attorneys' fees simply because Sara had "filed" petitions for contempt without any actual finding of contempt. *Hensarling*, 824 So. 2d at 593 (¶30). The chancellor did not address these issues, and the present record is insufficient for this Court to evaluate the reasonableness of the fees awarded.[21] For all these reasons, we should reverse the award of attorneys' fees and remand the case for additional findings.

¶84.    Greg also argues that the chancellor abused his discretion by denying Greg's motion in limine to exclude the testimony of Wright and Baladi and by overruling Greg's objections to Wright's one-page document and Baladi's records. I would address this issue by reversing and remanding with instructions for Sara to produce billing statements with enough detail for Greg to challenge the reasonableness of her attorneys' fees and for the chancellor to make findings of fact sufficient to support an award. I disagree with the lead opinion that Greg experienced "no 'undue prejudice'" from the manner in which this evidence was disclosed and admitted. *Ante* at ¶50. As discussed above, Sara never produced any detailed billing statements for the $377,490.14 in fees and expenses billed by the Wright firm, and she

---

[21] Moreover, "as a reviewing appellate body," it is not this Court's role "to make an original reasonableness determination" regarding hours expended in the trial court. *BellSouth Personal Commc'ns*, 912 So. 2d at 448 (¶37).

produced Baladi's records less than twenty-hours before trial began. Sara's failure to produce any detailed information in response to legitimate discovery requests and her untimely disclosure of only one attorney's records the day before trial deprived Greg of a fair opportunity to challenge the reasonableness of the fees she requested. I would reverse and remand, and I dissent for this reason as well.

**GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., JOIN THIS OPINION.**